**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHNNY LINDEL LEWIS,

         Petitioner,

    v.

ELVIN VALENZUELA, Warden,

         Respondent.

_____/

No. C-14-0071 EMC (pr)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

## I.   INTRODUCTION

    Johnny Lindel Lewis filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed an answer to the petition and Mr. Lewis has filed a traverse. For the reasons discussed below, the Court **DENIES** the petition.

## II.   BACKGROUND

A.   Facts

    Mr. Lewis was charged with murder and other crimes in a case in which the prosecutor's theory was that he had stabbed the victim, Robert Van Alstine, in the early hours of November 18, 2009. The California Court of Appeal described the evidence at length.

> On November 18, 2009, shortly after 4:00 a.m., Jorge Briseno heard banging at the door of the mill where he worked in Fields Landing. Upon opening the door, Van Alstine stepped into the mill and fell to the floor, holding his stomach. Van Alstine said: "Help me. Help me please. I'm dying" Briseno called 911 and reported that Van Alstine was bleeding from his stomach, said he had been stabbed and was dying, but would not say who had stabbed him.

> When police arrived, Van Alstine was unable to intelligently answer questions. He was transported to a hospital where it was determined that he had a critical wound to his lower right chest. Efforts to save Van Alstine were unsuccessful and he died.

An autopsy revealed that the primary wound was a single stab wound to the right chest. The wound was consistent with a person holding a knife slightly less than an inch wide in his right hand, standing with the victim's back toward the person holding the knife, reaching around the victim, and stabbing the victim in the right rib area. The knife penetrated the liver and the cause of death was the stab wound.

Van Alstine's residence was in Eureka above the California Market, which had video surveillance equipment installed. Detectives reviewed the video recordings and, based on the clothing he was wearing when he died, Van Alstine seemed to be in the recording about 3:55 a.m. on November 18, when a man got out of the passenger side of what appeared to be a red car and approached him. Van Alstine and the other man then moved outside of the camera's field.

On November 21, 2009, officers found a burned-out pink Ford Escort in a driveway. The owner of the residence said the car was not there earlier and he did not know to whom it belonged. The registered owner of the car, Andrea Marr, had reported it stolen. On the floor next to the passenger seat on the right side was the metal portion of a knife that was approximately four and a half inches long and three-quarters of an inch wide. The knife tested negative for blood, but the criminologist who tested the knife testified that it was possible to remove traces of blood from a knife and that a knife that had been in a fire would not be expected to test positive for blood.

Examination of Marr's cell phone records indicated that on November 18, 2009, at 3:36 and 3:48 a.m. her cell phone used a tower in Eureka. At 4:07 and 4:13 a.m. her cell phone used a tower in Loleta. At 4:34 and 4:40 a.m. her cell phone used towers heading south.

On November 24, 2009, detectives interviewed Marr, who said that she spent the nights of November 17 and 18, 2009, at home. She said she recognized Van Alstine from seeing his photograph in the newspaper but did not know him. Marr said she never loaned her car or cell phone to anyone. She said she parked her car and must have left the key in the door. When she returned, her car was gone. She denied being outside Eureka on November 18, 2009, and denied knowledge of the homicide or the people involved. She was not able to explain her vehicle being on the video surveillance recording or her cell phone making and receiving calls leaving Eureka and returning during the early morning hours.

Marr was arrested and charged with murder, at which point she made a different statement to the police. Marr testified at trial that in November 2009 she gave her friend, Maggie Sovereign, a ride from the clean and sober house where Sovereign lived in Eureka to Friendship House, a rehabilitation facility in San Francisco. Lewis, whom Marr knew as "Johnny George," Sovereign's boyfriend, rode with them. After dropping off Sovereign, Marr said she drove back to Eureka with Lewis. They arrived in Eureka in the middle of the night and Marr said that Lewis had been drinking Tequila on the way back. Marr related that Lewis had been upset about not seeing Sovereign for the six months she would be in treatment and that, in his emotional state, she did not want to leave him alone, so they drove around Eureka together.

Marr said that when they neared California Market, Lewis saw a man, whom Marr later learned to be Van Alstine, and asked Marr to pull over so he could talk to him. Lewis got out of the car, Marr explained, and asked Van Alstine if he wanted to go drink. Van Alstine agreed and got into the back seat. Marr testified that Lewis directed her to drive to Fields Landing. She remembered that Lewis told her that night that Van Alstine had slept with Sovereign during a period when Lewis was in jail, but she didn't remember at what point Lewis told her this.

Marr said that she parked in Fields Landing at Lewis's direction and Lewis and Van Alstine got out of the car. A couple of minutes later Marr said that she saw them fighting in her rearview mirror and she turned around to watch. She said that Lewis was punching Van Alstine, who was trying to block the punches. The fight ended when Lewis, who was behind Van Alstine, appeared to Marr to punch Van Alstine at a "weird angle" on his right ribs, after which Van Alstine ran away, yelling, "Johnny, I don't remember. I don't even know who your girlfriend is." According to Marr, Lewis returned to the car and told her to drive away with her headlights off, that he had to get rid of the knife, and that Van Alstine was going to die. Marr then drove back to Eureka with Lewis, but they may have first visited the house of Keta Rojas in Fields Landing. Marr did not remember whether the visit to Rojas's house occurred before or after Lewis's altercation with Van Alstine.

Marr later showed detectives Rojas's house and the location where the stabbing had occurred, approximately one-tenth of a mile from the mill where Van Alstine was found. Back in Eureka, Marr said that she and Lewis went to the home of Johnny Mahan, where Lewis washed the knife in the kitchen sink. Marr believed that Lewis traded the knife to Mahan for two wooden poles.

Over the next couple of days, Marr saw Jamie Rogers in Lewis's company. The last time Marr saw her car was when Rogers took it so that she could remove stickers and make it look less identifiable because the newspapers had reported that a car was observed in the California Market video surveillance. Rogers returned and told Marr to report the car stolen.

After making a statement to police, Marr pled guilty to being an accessory to murder after the fact, with a plea agreement specifying that if she testified against Lewis, she would be sentenced to probation and not to prison. Under the plea agreement, the murder charge was dropped.

Around 1:30 a.m. on December 4, 2009, Lewis was arrested for possession of a hypodermic needle and he was interviewed by Sergeant Wayne Hanson later that morning. Initially, Lewis could not recall anyone he knew with a red sedan, but when Hanson asked about Marr, Lewis admitted having ridden in her car with Sovereign, but only to pick up a prescription once during the daytime. Lewis claimed not to have been in Fields Landing for a few months. Hanson finally asked Lewis about riding in Marr's car about two weeks earlier, and Lewis admitted riding in the car when Marr took Sovereign to Friendship House but claimed to have gone straight back to the clean and sober house in Eureka. Hanson showed Lewis a photograph of Van Alstine and Lewis admitted knowing him on a casual basis, but said that he had not seen him for "a handful of months."

On further questioning, Lewis admitted that two to three weeks earlier, at six or seven in the evening, Marr was driving him to the store and that during the trip Marr had also given Van Alstine a ride and dropped him off somewhere. Then Lewis recalled that Van Alstine had jumped into the car with a friend of his, whom Lewis did not know, and Marr dropped them off at some apartments around midnight. Lewis denied getting into a fight with Van Alstine. Lewis also denied going to Fields Landing with Van Alstine. Questioned further, Lewis admitted to being in Fields Landing with Van Alstine "at Kita's." Lewis said that Van Alstine and his friend left the car in Fields Landing and he didn't know where they went. For the remainder of the interview, Lewis continued to deny fighting with Van Alstine or knowing who had stabbed him.

Jared Stapp lived at the clean and sober house where Sovereign and Lewis also lived. Stapp contacted police and told them that Lewis had told him that he had killed someone. He also said that there had been blood in a van that he had bought from Sovereign and that Lewis had left a sword at the clean and sober house. Detectives determined that the blood in the van was from a time before the Van Alstine homicide. Stapp showed the sword to an

investigating officer, but police determined that it had nothing to do with the case. Stapp also said that when Sovereign went to San Francisco, a friend drove her there and Lewis accompanied them. Stapp told the officer that Lewis had not returned to the clean and sober house that night, that he did not see Lewis for several days after Sovereign left, and that when Lewis did return, Lewis told him, "I killed somebody."

Rojas testified to having no memory of a visit by Lewis and Marr to her apartment in Fields Landing on November 18, 2009. However, cell phone records showed that the cell phone that Rojas was using sent a text message to Marr's phone at 6:16 a.m. on November 18, 2009: "Hey, it's Keta. Please don't stop by again until late morning when baby's awake. Thanks."

The police searched Mahan's house for a knife that Lewis may have used. Mahan said that he and Lewis often traded items and that he had once lent Lewis a Gerber knife, but that Lewis had returned it "a long time ago." The police took all of Mahan's knives, but none of them tested positive for blood. In a recorded conversation with police, Mahan said that the last time Lewis had been there, they argued about Sovereign and Lewis told him "don't put your hands in your pocket, like (inaudible) people are going to get stuck around here. Saying he was going to stab people or whatever...."

Hannah Mouser lived with Mahan, her boyfriend. She confirmed that Lewis and Mahan often traded items, including knives. Mouser said that Lewis and Mahan had argued because she was mad at Mahan and told Lewis, falsely, that Sovereign had sat on Mahan's lap. When detectives interviewed Mouser, she first confirmed that Lewis had traded a knife for sticks, but then said she was not sure the trade had actually occurred.

Lewis's clothes were collected and presumptive tests for blood were positive on his tennis shoes, T-shirt, and black hooded sweatshirt. Blood was conclusively found only on the T-shirt. A DNA test was performed and showed that the blood was Lewis's own blood.

California Court of Appeal Opinion filed June 27, 2012 in *People v. Lewis*, No. A130600

(hereinafter "Cal. Ct. App. Opinion") at 1-6.  (The opinion is at Docket # 21-3.)

B.    <u>Procedural History</u>

Mr. Lewis was convicted in Humboldt County Superior Court of first degree murder with personal use of a deadly and dangerous weapon.  On October 12, 2010, Mr. Lewis was sentenced to at total of 26 years to life in prison.

He appealed.  The California Court of Appeal affirmed his conviction and the California Supreme Court denied his petition for review in 2012.

Mr. Lewis then filed this action.  His petition for writ of habeas corpus raised four claims: (1) the trial court erred in admitting his statement to police as evidence at trial because he did not knowingly, intelligently, and voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 486 (1966) and did not voluntarily make the statement; (2) his due process rights were violated by admission of evidence, unrelated to the crime, concerning weapons in his possession, blood on his

4

United States District Court

For the Northern District of California

clothing, and blood in a van he once owned because that evidence tended to show criminal propensity; (3) trial counsel provided ineffective assistance by (a) failing to request a limiting instruction regarding evidence of a knife that Mr. Lewis had borrowed; and (b) failing to renew his objection to admission of evidence of blood found on Mr. Lewis' clothing.  Respondent has filed an answer and Mr. Lewis has filed a traverse.

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Humboldt County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

1  habeas court may not issue the writ simply because that court concludes in its independent judgment

2  that the relevant state-court decision applied clearly established federal law erroneously or

3  incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas

4  court making the 'unreasonable application' inquiry should ask whether the state court's application

5  of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

6  ## V.  DISCUSSION

7  A.      Mr. Lewis' Statement to Police

8          Mr. Lewis was arrested shortly after midnight on December 4, 2009.  After several hours of

9  sleep,[1] he was interrogated by sergeant Hanson while in custody.  Mr. Lewis filed an unsuccessful

10 motion to suppress his statement to police.  At trial, the prosecution introduced a redacted transcript

11 of the interview and played the audio portion of the videotaped interrogation.[2]      Mr. Lewis

12 contends that his statement was inadmissible because his waiver of rights was not knowing,

13 intelligent and voluntary.  He further alleges that the waiver and statement were involuntary due to

14 improper police tactics, namely that the police took advantage of the fact that he was experiencing

15 drug withdrawal symptoms and had a hangover at the time he was being interviewed.

16         1.      Knowing And Intelligent Waiver Of Miranda Rights

17                 a.      State Court Rejection Of Claim

18         The California Court of Appeal concluded that Mr. Lewis knowingly, intelligently, and

19 voluntarily waived his rights to silence and to counsel, and voluntarily made his statement to the

20 police.  Having made those determinations, the state appellate court declined to decide whether any

21 error would have been harmless.  The state appellate court explained its decision:

22         When Hanson interviewed Lewis he did not initially provide a Miranda warning. Lewis's
           statements made before the warning are not at issue and after a brief exchange, Hanson said:
23         "Cause you're, you're in jail so you have the right to remain silent. Anything that you say
           can and will be used against you in a court of law. You have the right to have an attorney and
24

25         [1] Mr. Lewis was arrested shortly after midnight, and was interrogated at about 7:45 a.m.  *See*
26 Docket # 19-1 at 17.

27         [2] The redacted portions "included statements that Lewis was in handcuffs during the
   interview, information related to other crimes, reference to the polygraph, and Hanson's assertions
   during questioning that 'all the witnesses' said that Lewis stabbed Van Alstine."  Cal. Ct. App.
28 Opinion at 7.

to have an attorney present before and during questioning. If you can not afford an attorney, one will be appointed free of charge to represent you before and during questioning if you desire, uh you can, you can decide at any time to exercise these rights and not answer any, excuse me, you can decide at any time to exercise these and not answer questions or make any statements, do you understand these, of these rights I explained to you?" Lewis said, "I yeah I understand what you're saying." Hanson shortly thereafter again asked Lewis, "Okay, well I mean you understand your rights right?" Lewis answered, "Yeah."

Hanson attempted to obtain an explicit verbal waiver from Lewis, several times asking if Lewis wanted to talk with him. Lewis would not answer directly, instead explaining that he didn't understand what was going on, but nonetheless talking with Hanson. Finally, Hanson said, "Okay well, well it sounds like you're willing to talk to me, you understand your rights and you're willing to talk to me, is that correct.?" Lewis again did not answer directly, but asked what they were going to talk about. From that point, Lewis continued to talk for an extended period of time with Hanson.

Lewis told Hanson several times that he was "lost" and didn't understand what was going on: "I don't know what's going on here"; "um I'm kind of lost right now" I mean all I know is that I got arrested last night and they found a hypodermic on me"; "I don't know, I don't know what's going on man ... I'm like basically—what I'm saying is I'm kind of lost right now"; "well I know I'm getting arrested for a hypodermic and I'm sitting here in front of you and your reading me my rights"; I'm not understanding what's going on"; "I'm kind of lost a little bit"; "I'm kind of lost right now"; "I'm just like I'm kind of lost, I'm just waking up, um, and I'm like wow I mean."

Lewis argues that his expressions about not understanding what was going on and being "lost" indicate so confused a state of mind that he could not knowingly and intelligently waive his Miranda rights. The interview as a whole, however, does not indicate a confused state of mind. Lewis talked with Hanson for an extended period. Lewis understood Hanson's questions and he provided meaningful responses, gradually providing more information as it became apparent that prior statements would not satisfy Hanson.

When Lewis stated that he was "lost" and did not know what was going on, he knew that he had been arrested for possession of a hypodermic needle and was being questioned by police, but there was no reason for him to assume that he was a suspect in Van Alstine's murder, which occurred more than two weeks earlier. Without other indicia of confusion, Lewis's statements about not knowing what was going on and about being "lost" are most naturally interpreted as lack of awareness of the purpose of the questioning. We do not discern such a state of mental confusion that Lewis was unaware of the meaning of his rights or the use to which his statements might be put. Nor were there indications that Lewis was so confused that he could not knowingly and intelligently waive the rights secured by Miranda.

Late in the interview, Hanson told Lewis, "Okay we'll end the conversation and the next time I bring you down, I'll have a polygraph set up for you." Lewis responded, "You know I mean it's like fucking well can we, what you can do that without a lawyer[?] I mean I'm like (inaudible) I don't even got a lawyer [.] I mean how can you just force all this with out a lawyer[?] I mean I'm not trying you know what I mean I know my rights a little bit (inaudible)." Lewis contends that this statement demonstrates that he did not have a basic comprehension of the right to have counsel present during the questioning. However, this statement, in context, does not concern his right to have an attorney present during the interview then taking place. Instead, Lewis was challenging whether Hanson could, in the future, actually compel a polygraph examination without advice from counsel. The remark does not indicate that Lewis was unaware of his right to the presence of counsel; rather, it indicates that Lewis fully understood his right not to undergo a polygraph examination without the benefit of an attorney, should he request one.

7

Hanson provided Lewis a valid Miranda warning and Lewis expressly stated that he understood his rights. Lewis then talked at length with Hanson in a way that demonstrated that he understood Hanson's questions and that, as the interview went on, he understood he was a suspect in the murder of Van Alstine. Contrary to Lewis's contentions, we do not find evidence, considering the interview as a whole, that Lewis exhibited extreme mental confusion or a misunderstanding of his rights. We conclude that by his behavior, Lewis implicitly waived his rights and that this waiver was knowing and intelligent.

Cal. Ct. App. Opinion at 8-11 (footnote omitted).

                b.    <u>Analysis</u>

A person subjected to custodial interrogation must be advised that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Once properly advised of his rights, an accused may waive them voluntarily, knowingly, and intelligently. *See id.* A valid waiver of *Miranda* rights depends upon the totality of the circumstances. "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Although some earlier Supreme Court cases had indicated the government had a "heavy burden" to show waiver, *Berghuis* explained that the burden was not too onerous. *Berghuis*, 560 U.S. at 384. The waiver may be implied by conduct, and need not be explicit or written. *Id.* at 383.

> If the State establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a valid waiver" of Miranda rights. The prosecution must make the additional showing that the accused understood these rights. Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. . . . As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.

*Berghuis*, 560 U.S. at 384-85 (citations omitted).

The California Court of Appeal's determination that Mr. Lewis knowingly and intelligently waived his *Miranda* rights was not contrary to or an unreasonable application of these Supreme

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Court holdings.  Although Mr. Lewis did not expressly waive his *Miranda* rights, his behavior

2    showed an implied waiver of those rights.  Mr. Lewis stated that he did "understand what you're

3    saying" after sergeant Hanson read him his *Miranda* rights.  CT 140.  And, when asked a second

4    time – "Okay well I mean you understand your rights right?" – Mr. Lewis responded, "yeah."  CT

5    141.  He thereafter began talking but avoided providing an explicit verbal waiver of his *Miranda*

6    rights.  After a couple of comments, sergeant Hanson said, "Okay well, well it sounds like you're

7    willing to talk to me, you understand your rights and you're willing to talk to me, is that correct?"

8    CT 141.  Mr. Lewis responded, "What are we gonna talk about?" rather than expressing any desire

9    not to talk.  CT 141.

10         Mr. Lewis argues that his repeated comments that he was "lost" and did not understand what

11   was going on showed that he did not make a knowing and intelligent waiver of his *Miranda* rights.

12   The state appellate court rejected this argument, concluding that the totality of the interview did not

13   indicate a confused state of mind – Mr. Lewis understood the questions and provided meaningful

14   responses.  That was not an unreasonable determination of the facts in light of the record.  *See, e.g.,*

15   *Sechrest v. Ignacio*, 549 F.3d 789, 805-06 (9th Cir. 2008) (finding petitioner's waiver knowing and

16   voluntary where officer's questions to petitioner after petitioner was read his *Miranda* rights were

17   requests for clarification of petitioner's unclear statements regarding his desire to speak to police);

18   *Paulino v. Castro*, 371 F.3d 1083, 1086-87 (9th Cir. 2004) (statement that suspect understood his

19   rights and wanted to talk to officer sufficient to waive right to counsel); *United States v. Parra*

20   *Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997) (recitation of rights in English and supervision of

21   reading in Spanish, accompanied by officer's confirming that defendant understood his rights,

22   sufficient to establish that defendant knew his rights and knowingly and intelligently waived them).

23   Like the state court, this court does not see Mr. Lewis' comments as reflecting confusion about the

24   *Miranda* rights.  If anything, Mr. Lewis was perplexed – or at least tried to convey to the sergeant

25   that he was perplexed – as to why an interrogation was necessary since he had been arrested on only

26   a misdemeanor drug charge.  Mr. Lewis has identified no authority supporting the view that a

27   suspect's unawareness of the particular crime for which he is being interrogated does not make the

28   *Miranda* waiver unknowing or unintelligent.  *Cf. Colorado v. Spring* 479 U.S. 564, 576 (1987) ("we

United States District Court

For the Northern District of California

1 hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation

2 is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived

3 his Fifth Amendment privilege").

4        2.    <u>Voluntary Waiver Of Miranda Rights</u>

5            a.    <u>State Court Rejection Of Claim</u>

6        The California Court of Appeal also rejected Mr. Lewis' argument that his waiver and

7 statement were involuntary.  The state appellate court recited the basic standards for voluntariness of

8 a waiver and cited a state court case as authority for the rules on voluntariness of waiver, although

9 the rules parallel those articulated by the U.S. Supreme Court.  *See* Cal. Ct. App. Opinion at 11

10 (quoting *People v. McWhorter*, 47 Cal. 4th 318, 346-47 (2009)). The *McWhorter* case cited, among

11 other authorities, *Mincey v. Arizona*, 437 U.S. 385, 398 (1978), for the proposition that a statement is

12 not voluntary if it is not the product of "a rational intellect and free will," and *Colorado v. Connelly*,

13 479 U.S. 157, 167 (1986), for the proposition that a "finding of coercive police activity is a

14 prerequisite to a finding that a confession was involuntary under the federal and state Constitutions."

15 The California Court of Appeal explained its rejection of the challenge to the voluntariness of Mr.

16 Lewis' statement.

17     Lewis first argues that the police deceived him into believing that the questioning would be
brief and would concern his arrest for possession of a hypodermic needle. One of Hanson's

18 early questions was, "Did you get arrested last night?" Lewis believes that this indicated that
this arrest would be the topic of the interview. When Lewis asked to use the bathroom,

19 Hanson responded, "Yeah well this may only take a second" and that they would "get to the
bathroom request here in a second." Lewis does not explain how this "deception" operated to

20 coerce his waiver or statement in conjunction with his symptoms of drug withdrawal.
Knowing that he would be questioned about matters unrelated to the reason he was arrested

21 and that the interview might be lengthy "could affect only the wisdom of a Miranda waiver,
not its essentially voluntary and knowing nature." (*Colorado v. Spring* (1987) 479 U.S. 564,

22 577.) Hanson made no threats or promises and did not exert improper influence.

23     Second, Lewis contends that Hanson "trivialized and downplayed the importance" of his
rights because, before informing Lewis of his rights, Hanson said, "Okay because you have

24 those bracelets on, you're, you're in handcuffs, I have to read you your rights okay?" Lewis
relies on *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1237: "[E]vidence of police efforts

25 to trivialize the rights accorded suspects by the Miranda decision—by 'playing down,' for
example, or minimizing their legal significance—may under some circumstances suggest a

26 species of prohibited trickery and weighs against a finding that the suspect's waiver was
knowing, informed, and intelligent."

27     Here, the fact that Lewis was in handcuffs, had been arrested, and was not free to leave

28 meant that Hanson was proposing a custodial interrogation. Hanson's observation was

merely an acknowledgment that the circumstances required that the Miranda warnings be given. It is not an obvious inference that Hanson sought, by his comment, to trivialize or minimize the importance of Lewis's rights, nor does Lewis point to any additional evidence that would support such an inference. Indeed, Hanson asked Lewis three times whether he understood his rights, which is inconsistent with an attempt to minimize their importance. We discern nothing improper in Hanson's comment.

Third, Lewis contends that the police timed his arrest with knowledge that he would be suffering from the discomfort and withdrawal of recent drug use. He argues that during the interview he experienced obvious drug withdrawal symptoms and was questioned after only a few hours of sleep. During the interview, he stated numerous times that he was tired, hung over, detoxing, and had "cotton mouth." Lewis believes that "the police intentionally created the environment for appellant's physical condition to be exploited by additional physical and psychological pressures," rendering his waiver and statement involuntary.

When a defendant is experiencing the symptoms of drug withdrawal, that fact alone does not render a waiver or statement involuntary. (*U.S. v. Coleman* (9th Cir.2000) 208 F.3d 786, 791 ["Nor did Defendant's symptoms of heroin withdrawal render his statements involuntary. Although Defendant's heroin withdrawal caused lethargy and physical discomfort, such symptoms alone are insufficient to establish involuntariness."].) As indicated above, there must, in addition to the symptoms of drug withdrawal be some showing of coercive police activity as a necessary predicate.

At one point during the interview, Hanson told Lewis: "Since November the eighteenth ... there has been three detectives tracking you and everybody else in this case and people are talking so here we're sitting talking to you...." At another point, Hanson told Lewis that they had not arrested him earlier so that he "could sink [his] own boat by talking to everybody in Eureka." Neither this or anything else that Hanson said during the interview justifies an inference that Lewis's arrest was timed to take advantage of symptoms of drug withdrawal during his interrogation.

Having discerned no improper tactics on the part of the police in the interview with Lewis, we conclude that there was no coercion or inducement that operated to render Lewis's waiver or his statement involuntary. Without coercion, inducement or improper influence on the part of the police, Lewis's argument that his waiver and statement were involuntary fail. We are left with an argument based solely on Lewis's physical symptoms of drug withdrawal, which standing alone do not suffice to establish involuntariness and which were not so severe as to prevent Lewis from meaningfully answering Hanson's questions for an extended period. No circumstances of the interview support a conclusion that Lewis's waiver or statement were involuntary.

   b. <u>Analysis</u>

Although the burden is on the government to prove voluntariness of a waiver of one's

*Miranda* rights , a waiver cannot be held involuntary absent official compulsion or coercion.

"*Miranda* protects defendants against government coercion leading them to surrender rights

protected by the Fifth Amendment; it goes no further than that." *Colorado v. Connelly*, 479 U.S. at

170.

United States District Court

For the Northern District of California

1    Mr. Lewis has not demonstrated that the state appellate court's opinion was contrary to, or an

2    unreasonable application of, the clearly established federal law.  After evaluating the circumstances

3    surrounding the interrogation, the state appellate court found that there was no police coercion or

4    inducement that rendered Mr. Lewis' waiver or statement involuntary.  Cal. Ct. App. Opinion at 13.

5    Federal law, as determined by the United States Supreme Court, requires that there be official

6    compulsion or coercion to find a *Miranda* waiver involuntary.  *See Colorado v. Connelly*, 479 U.S.

7    at 170.  Accordingly, the state appellate court's conclusion that, due to the absence of any

8    compulsion, Mr. Lewis did not establish that his waiver was involuntary is not contrary to, or an

9    unreasonable application of, clearly established federal law.  Nor was the state appellate court's

10   opinion based on an unreasonable determination of the facts.  The facts do not support a finding of

11   involuntariness due to Mr. Lewis' assertion that he was "detoxing" from drug usage and had a

12   hangover.  *See United States v. Rodriguez-Rodriguez*, 393 F.3d 849, 855 (9th Cir. 2005) (district

13   court did not err in concluding that suspect who was experiencing acute heroin withdrawal, but who

14   was nonetheless coherent, speaking and acting normally, voluntarily and intelligently waived his

15   *Miranda* rights); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (defendant's

16   symptoms of heroin may have caused lethargy and physical discomfort, but such symptoms alone

17   are insufficient to establish involuntariness).

18       3.    Mr. Lewis Did Not Invoke His Right To Counsel

19   Mr. Lewis mentioned the word "lawyer" three times in his interrogation and contends that

20   this was an invocation of his right to counsel. The relevant comments occurred toward the very end

21   of the interview, i.e., starting on page 81 of the 94-page interview transcript.  The following was said

22   by sergeant W. Hanson (WH) and Mr. Lewis (JL):

23   WH:   I'm not fucking around with you at all Johnny, it, it, its, if you want to take a polygraph,
            you're a man you're twenty eight (28) years old, to prove that you're innocent that's that's
24          your decision.  Remember what I told you when you got back to your cell about everybody
            talking, or you wouldn't be here right now.
25
     JL:   (Inaudible) that copy pulled up and just huh, you know what I mean (inaudible).
26
     WH:   I sent them looking for you Johnny.
27
     JL:   Huh?
28

**United States District Court**
For the Northern District of California

1    WH:    I sent the cops looking for you, I got a phone call.

2    JL:    You sent the cop looking for me, that's kind of funny because they'll all, they see me
            everyday, they never came and approached me about this then you know what I mean, that's
3           why I'm like kind of thrown off here.

4    WH:    Yeah because I told you there's been three (3) detectives on this since the eighteenth (18th)
            of November, I don't want to contact you on the nineteenth (19th) or twentieth (20th), I want
5           you to sink your own boat by talking to everybody in Eureka.

6    JL:    I'm talking to everybody, no no.

7    WH:    Okay so.

8    JL:    I mean I'm not.

9    WH:    we'll, we'll get you downstairs here at two (2) o'clock for a uh, uh polygraph then?

10   JL:    (inaudible) do this without a **lawyer**, because it's like, it's like you're like throwing all this at
            me.
11
     WH:    Uh huh.
12
     JL:    It's like and I'm sitting here like what's going on, you're arresting or you know what I mean.
13
     WH:    No, no, for the, for the fifth (5th) time, I'm not arresting you currently for a homicide you're
14          in custody for the possession of a hypodermic needle,

15   CT 216 (emphasis added).  After a few more exchanges, the sergeant repeatedly again asked

16   whether Mr. Lewis would take a polygraph test, and the following was said.

17   WH:    Yes or no are you willing to take a polygraph?

18   JL     look I am detoxing right now, okay I'm, I'm trying to maintain a conversation with you.

19   WH:    Johnny, Johnny it's either yes or no.

20   JL:    I understand that man, but you been fucking sitting here fucking with me man, you sat there
            with your own words and told me it's like I'm feeling like you're gonna throw this sit on me
21          dude, I didn't even fucking do it, you know what I mean and I told you I'm trying to
            (inaudible), I'm trying to have a decent conversation with you, trying to hold my cool with
22          you right now, I told you I'm fucking detoxing man, you know what I mean and then it's like
            I ask you a question I mean are you arresting me or what are you doing, you're like no I'm
23          not arresting you at all, and it's like it's a back and forth shit man.

24   WH:    Not yet Johnny.

25   JL:    You know, okay now you're saying not yet, you know what I mean and it's like well hold on
            here you know and it's like you're, you want to throw all this stuff on me, where's our
26          **lawyer**, I mean I'm not trying to fuck with you man.

27   WH:    Okay I, I think we're spinning our wheels, I'll put you back up, upstairs.

28

13

1  JL:   I mean if you want to we'll talk later whatever but it's like it's like it seems like you're fucking forcing shit on me man, that's what I'm feeling, I'm trying, I was trying to tell you
2        that at the beginning of this conversation to begin with.

3  WH:   Okay we'll end the conversation and the next time I bring you down, I'll have a polygraph set up for you.
4

5  JL:   You know I mean it's like fucking well can we, what you can do that without a **lawyer**, I mean I'm like (inaudible) I don't even got a **lawyer**, I mean how can you just force all this
6        without a **lawyer**, I mean I'm not trying you know what I mean I know my rights a little bit (inaudible).

7  WH:   Okay.

8  JL:   But at the same time I'm not trying to fucking tug a war and fuck with you either, it's like wow, you know what I'm saying.
9

10 CT 217-218 (emphasis added).  Mr. Lewis continued to talk with minimal prompting by the

11 sergeant.

12              a.     State Court Rejection Of Claim

13        The California Court of Appeal rejected Mr. Lewis' contention that he had invoked his right

14 to counsel.  The state appellate court identified the controlling law as *Davis v. United States*, 512

15 U.S. 452, 459 (1994), which held that a suspect must invoke the right "unambiguously," and

16 *Berghuis v. Thompkins*, 560 U.S. 370 (2010), which held that police are not required to end the

17 interrogation or ask clarifying questions when an accused makes a statement "that is ambiguous or

18 equivocal."  Cal. Ct. App. Opinion at 14.

19              Each time that Lewis mentioned a lawyer, it was in connection with
                Hanson's suggestion that Lewis take a polygraph test. As discussed
20              above, these statements are most easily interpreted as expressing
                unwillingness to undergo a future polygraph test without benefit of
21              counsel rather than an unwillingness to continue the current interview
                without benefit of counsel. At best, Lewis's statements concerning
22              counsel were ambiguous, but ambiguous statements about counsel are
                not sufficient to invoke the right to counsel.
23

24 *Id.* at 14.

25              b.     Analysis

26        An accused who has "expressed his desire to deal with the police only through counsel, is not

27 subject to further interrogation by the authorities until counsel has been made available to him,

28

United States District Court

For the Northern District of California

1  unless the accused himself initiates further communication, exchanges, or conversations with the

2  police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).[3]

3       *Davis v. United States*, 512 U.S. 452 (1994), addressed the question of how "law

4  enforcement officers should respond when a suspect makes a reference to counsel that is

5  insufficiently clear to invoke the *Edwards* prohibition on further questioning." *Davis*, 512 U.S. at

6  454.  The Court concluded that an ambiguous statement does not trigger the *Edwards* duty to stop

7  the interrogation.

8            [T]he suspect must unambiguously request counsel. As we have
             observed, "a statement either is such an assertion of the right to
9            counsel or it is not." *Smith v. Illinois*, 469 U.S., at 97–98, 105 S.Ct., at
             494 (brackets and internal quotation marks omitted). Although a
10           suspect need not "speak with the discrimination of an Oxford don,"
             post, at 2364 (SOUTER, J., concurring in judgment), he must
11           articulate his desire to have counsel present sufficiently clearly that a
             reasonable police officer in the circumstances would understand the
12           statement to be a request for an attorney. If the statement fails to meet
             the requisite level of clarity, *Edwards* does not require that the officers
13           stop questioning the suspect.

14  *Davis*, 512 U.S. at 459.  The Supreme Court also "decline[d] to adopt a rule requiring officers to ask

15  clarifying questions.  If the suspect's statement is not an unambiguous or unequivocal request for

16  counsel, the officers have no obligation to stop questioning him." *Id.*

17       The California Court of Appeal's determination that Mr. Lewis' mention of a lawyer was not

18  an unambiguous request for counsel and therefore did not require that the interrogation stop was not

19  an unreasonable application of *Davis*.  Each time Mr. Lewis mentioned the word "lawyer," it

20  appeared in a sentence that seemed ambiguous:

21            • "(inaudible) do this without a lawyer, because it's like, it's like you're like throwing
             all this at me."

22  _____

23       [3] In *Edwards*, the request was clear: the suspect gave a statement presenting an alibi defense
24  and then said that he wanted to "make a deal."  The interrogating officer said he wanted a statement,
    but did not have authority to negotiate a deal and provided the suspect with a telephone number for a
25  county attorney.  The suspect called the attorney and hung up after a few minutes.  He then said "I
    want an attorney before making a deal." *Edwards*, 451 U.S. at 479.  Questioning ceased and the
26  accused was taken to the county jail, but was interrogated again the next morning.  When the
    detention officer told him detectives wanted to speak to him, he replied that he did not want to talk
27  to anyone.  The guard then told him "'he had' to talk and then took him to meet with the detectives."
    *Id.*  The officers advised him of his *Miranda* rights, and he made a statement incriminating himself.
28  The Court held that this statement was obtained in violation of *Miranda* and was inadmissible.  *Id.* at
    487.

15

1

2          • "You know, okay now you're saying not yet, you know what I mean and it's like
           well hold on here you know and it's like you're, you want to throw all this stuff on

3          me, where's our lawyer, I mean I'm not trying to fuck with you man."

           • "You know I mean it's like fucking well can we, what you can do that without a
4          lawyer, I mean I'm like (inaudible) I don't even got a lawyer, I mean how can you
           just force all this without a lawyer, I mean I'm not trying you know what I mean I

5          know my rights a little bit (inaudible)."

6    However, these statements were less ambiguous when viewed in context.  Mr. Lewis' mention of a

7    lawyer was preceded by an inquiry by the sergeant as to whether Mr. Lewis would agree to take a

8    polygraph test that afternoon.  The state appellate court reasonably determined that Mr. Lewis'

9    references to a lawyer were an expression of unwillingness to undergo a polygraph without a lawyer

10   rather than an expression of a desire to talk to a lawyer before continuing the interrogation at that

11   point.  *See* Cal. Ct. App. Opinion at 14.  The mere fact that the word "lawyer" crossed Mr. Lewis'

12   lips was not enough to be an invocation of his right to counsel because his statements were not

13   unequivocal and unambiguous requests for counsel in connection with the interrogation.  *See, e.g.,*

14   *Davis*, 512 U.S. at 459-62 ("Maybe I should talk to a lawyer" insufficient); *Sechrest v. Ignacio*, 549

15   F.3d 789, 807 (9th Cir. 2008) (suspect's mention of an attorney and reference to advice from

16   attorney that suspect "keep his mouth shut" was not unambiguous request for counsel); *United*

17   *States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) (defendant's statement "[b]ut, excuse me, if I

18   am right, I can have a lawyer present through all this, right?"does not constitute unambiguous

19   invocation of right to counsel); *Paulino v. Castro*, 371 F.3d 1083, 1087-88 (9th Cir. 2004) (state

20   courts' holding that "Where's my attorney?" and "You mean it's gonna take him long to come?,"

21   plus failure to fill in item on waiver form asking whether suspect wishes to give up right to counsel,

22   was not unequivocal demand for counsel not unreasonable under AEDPA standard); *Clark v.*

23   *Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (holding that state court's conclusion that "I think I

24   would like to talk to a lawyer" and "should I be telling you, or should I talk to an attorney?" were

25   not unambiguous requests for counsel was not objectively unreasonable application of *Davis*).

26   *Davis* did not require that the sergeant ask questions to clarify whether Mr. Lewis wanted to invoke

27   his *Miranda* rights before further interrogation.  *See Davis*, 512 U.S. at 461-62.

28

United States District Court

For the Northern District of California

4.      Mr. Lewis Did Not Evoke Right To Remain Silent

Mr. Lewis urges here, as in state court, that his requests to remain silent were ignored by the interrogator, thereby making his statement inadmissible.  He points to various statements he made toward the end of the interview as demonstrating the sergeant's failure to heed his request to remain silent.  As in state court, Mr. Lewis includes this argument about an invocation of his right to remain silent within his claim that he invoked his right to counsel. This court agrees with the state appellate court's view that "such statements have nothing to do with invocation of the right to counsel," Cal. Ct. App. Opinion at 14-15, and therefore need to be analyzed as whether he invoked his right to silence.

Toward the end of his interview, Mr. Lewis stated, "You know what no disrespect or nothing you know what I mean if possible I go up to my cell or whatever cause I'm fucking detoxing right now." CT 207.  Sergeant Hanson responded, "Mm hmm," and Mr. Lewis resumed talking.  CT 208. Later, Mr. Lewis stated, "(Inaudible) go back to my cell and lay, lay down or something because it's like I'm, I'm fucking, I'm hung the fuck over and I'm detoxing right now you know what I mean and I'm like and I'm not trying to fuck around or nothing but the same time I'm not liking the fact that you're sitting here telling me you're gonna fucking pin this shit on my though you know what I mean I did not."  CT 211.  The sergeant said he was just "being honest with you" about the questions, and Mr. Lewis continued to talk.  *Id.*  A few pages later in the transcript, Mr. Lewis said, "I don't know man I feel like I don't know what we're going with this I don't know how far or this or, or what's going on I'd like to go to my room please, you know what I mean but at the same time, I'm not" trying to be difficult.  CT 215.  Again the sergeant did not refuse to end the interview and said only, "talk some more this afternoon?" to which Mr. Lewis responded, "I'm just saying we can talk whatever okay but right now I'm like fucking you know what I mean I'm getting cotton mouth and all that you know what I mean and it's like, you're, you know what I mean that, I'm just like, I'm not trying to be an ass or nothing but it's like I'm (inaudible) what's going on are you re-arresting me right now or what's the deal here because it's like from here the words that are coming from your mouth is fucking with me dude, it's like I don't."  CT 215.   A few pages later, the sergeant said, "you told me you didn't want to talk, you wanted to go back to your cell so we'll end

United States District Court

For the Northern District of California

the conversation and you can go back up stairs."  CT 219.  Mr. Lewis kept talking and the interview

continued for a short while, as reflected by ten more pages of transcript.

> a.   State Court Rejection of Claim

The California Court of Appeal rejected the suggestion that these statements amounted to an

invocation of the right to remain silent.

> These statements by Lewis indicate that he was physically
> uncomfortable and would rather have been lying in his cell than facing
> Hanson's questions. However, these statements were not invocations
> of Lewis's right to silence. Lewis continued to talk with Hanson after
> each of these statements, and the last of these statements makes it clear
> that Lewis remained willing to talk with Hanson, but would rather do
> it later. We conclude that Lewis did not invoke his right to
> silence.FN2
>
>> FN2. Even if we were to conclude that Hanson's
>> statements that he would rather be in his cell were
>> ambiguous, the Supreme Court has ruled that, like
>> ambiguous invocations of the right to counsel,
>> ambiguous invocations of the right to silence do not
>> suffice. (*Berghuis v. Thompkins, supra*, 560 U.S. at p.
>> ___ [130 S.Ct. at p. 2260]; *People v. Bacon* (2010) 50
>> Cal.4th 1082, 1107, fn. 5.)

Cal. Ct. App. Opinion at 15.

> b.   Analysis

An analysis similar to the one discussed above for a request for counsel during a custodial

interrogation applies when a suspect invokes his right to remain silent.  Specifically, if a suspect

indicates in any manner during questioning that he wishes to remain silent, interrogation must cease

and any statement obtained thereafter is considered the product of compulsion.  *Miranda*, 384 U.S.

at 473-74.  A suspect who wishes to invoke the right to remain silent must do so unambiguously,

however.  *Berghuis*, 560 U.S. at 382.  "A requirement of an unambiguous invocation of

*Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s]

guidance to officers' on how to proceed in the face of ambiguity."  *Id.* (quoting *Davis*, 512 U.S. at

458-59).  A suspect who "did not say that he wanted to remain silent or that he did not want to talk

with the police" has not invoked his right to remain silent.  *Berghuis*, 560 U.S. at 382.

The rejection of Mr. Lewis' claim by the California Court of Appeal was not inconsistent

with *Berghuis*, where the Supreme Court had found a failure to invoke the right to remain silent on

United States District Court

For the Northern District of California

1   much more compelling facts.  The suspect in *Berghuis* did not say that he wanted to remain silent or

2   that he did not want to talk to the police; however, he did not answer questions for almost three

3   hours of interrogation before one question caused him to well up with tears and confess.  *See id.* at

4   375-76.  That lengthy silence was not enough to invoke the right to remain silent so as to require a

5   cessation of the interrogation.  *Id.* at 382.  The accused's statement, even though it followed a

6   lengthy silence, was an implicit waiver of the right to remain silent.  *See id.* at 385; *see also id.* at

7   385 ("there is no contention that [the accused] did not understand his rights; and from this it follows

8   that he knew what he gave up when he spoke").

9         The California Court of Appeal's determination that Mr. Lewis had not invoked his right to

10  remain silent was not an unreasonable application of clearly established Supreme Court authority.

11  Mr. Lewis' statements that he would prefer to be in a cell "detoxing" were not a clear invocation of

12  his right to remain silent.  *See, e.g., DeWeaver v. Runnels*, 556 F.3d 995, 998-99 (pre-*Berghuis*

13  decision applying *Davis* and concluding that the suspect's statement during interview that he wanted

14  to go back to the jail was not an unambiguous invocation of right to remain silent and therefore he

15  was not entitled to habeas relief); *Welch v. Harrington*, 2010 WL 4794237, *9 (E.D. Cal. 2010)

16  (habeas relief denied because petitioner's statement during interrogation, "I want to go back to my

17  cell," was not an unambiguous invocation of right to remain silent).   Further, the transcript shows

18  that Mr. Lewis resumed talking after each of these statements, without any intervening question

19  from the police sergeant. By saying he would rather be elsewhere in one breath and continuing to

20  talk in the next breath, Mr. Lewis was conveying at least a mixed message and a mixed message is

21  not an unambiguous invocation of the right to remain silent.  Mr. Lewis was a talkative interviewee,

22  and his decision to continue talking (without a question being posed) after making each of these

23  statements supports the state appellate court's conclusion that he had not unambiguously invoked his

24  right to remain silent.  *See generally Berghuis*, 560 U.S. at 385 ("As a general proposition, the law

25  can presume that an individual who, with a full understanding of his or her rights, acts in a manner

26  inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights

27  afford.")

28

Mr. Lewis is not entitled to habeas relief on his challenges to the admission of his statement to the police. The California Court of Appeal's rejection of Mr. Lewis' several challenges to the admission of his statement to the police was not contrary to or an unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court.

B.    Admission of Evidence Claim

Mr. Lewis claims that his right to due process was violated by the admission of certain evidence unrelated to the crime.  The challenged evidence concerned weapons in Mr. Lewis' possession, blood in a van he once owned, and blood on his clothing.  Other than the blood on the clothing, the evidence was admitted for impeachment of two witnesses who claimed to have memory problems on the witness stand – memory problems the trial judge thought were feigned.

1.    State Court Proceedings And State Law Rulings

a.    The Gerber Knife

Evidence was admitted that showed that Mr. Lewis had borrowed a Gerber-brand knife from Johnny Mahan on one past occasion to deal with some people with whom Mr. Lewis was having a problem.  Mr. Lewis contends that the introduction of this evidence to impeach Mr. Mahan's credibility violated Mr. Lewis' rights because it suggested that Mr. Lewis had a criminal or violent propensity.  *See* Docket # 1 at 49-51.  In Mr. Lewis' view, the evidence had little probative value because Mr. Mahan's credibility was already discredited (with evidence of his felony convictions, and his impaired memory due to drug use and a brain injury as a child) but came with a lot of potential prejudice in that it suggested to the jury that Mr. Lewis had a criminal propensity because he once borrowed a knife to deal with some people with whom he was having a problem.

The evidence regarding the Gerber knife was impeachment evidence to show that he had lied to police about the reason offered by Mr. Lewis for borrowing the knife.  Mr. Mahan had testified that Mr. Lewis borrowed the Gerber knife to go fishing.  RT 315, 317, 324, 335.  Evidence then was presented by the prosecutor (over a defense objection) that Mr. Mahan had told detectives that Mr. Lewis "came over and was saying the guys at Bovencamp's were giving [Mr. Lewis] a hard time, so [Mr. Lewis] needed to borrow a knife," and Mr. Mahan lent him the Gerber knife.  RT 644.

United States District Court
For the Northern District of California

1   Although the Gerber knife was not connected to the killing and the particular purpose for

2   borrowing the knife was not critical, Mr. Mahan's credibility was at issue and the contradiction

3   between his statement to the police and his testimony served to impeach that credibility.  Mr.

4   Mahan's credibility was at issue because his testimony was contrary to that of other witnesses on

5   important points.  Most notably, Ms. Marr told police and testified that Mr. Lewis washed off a knife

6   in Mr. Mahan's kitchen sink in Mr. Mahan's presence on the morning of the killing, whereas Mr.

7   Mahan testified that he did not remember any such incident.[4]  And Mr. Mahan had provided a story

8   to police that conflicted with his trial testimony in other ways.[5]   The trial court saw Mr. Mahan's

9   credibility as quite significant, and that the Gerber knife evidence went to that credibility:

> I think the credibility of Mr. Mahan's overall testimony here,
> especially in light of the fact that we've had another witness say that
> they saw something happening with a knife in the apartment, correct,
> the washing of the knife and the like. . . . Now we have Mr. Mahan
> knowing nothing about anything on that date.  Someone is not being
> truthful here and so to test his credibility, that's a very critical part of
> this case.  Did someone observe Mr. Lewis washing a knife at an
> apartment that date?  And it's alleged to have happened at Mr.
> Mahan's apartment.  Mr. Mahan was supposed to be, like, within two
> feet or so and now we have Mr. Mahan having very limited memory of
> certain things but of other things he seems to.  And then previously
> when questioned by law enforcement, had a pretty darn good memory
> then.  And so I do think his credibility is a critical part on that point. . .
> .  So, for that purpose, I do find that I would allow this impeachment,
> which is, I think, an express evidence showing you said something on
> the stand here, previously he said something else.  And I think it's
> very clear it has nothing to do with the same knife.  I think that can be
> cleared up, but it has to do more with what Mr. Mahan is willing to
> say now about what he may know in the case.  And the jury is entitled

---

[4] Ms. Marr testified that, after the killing, she and Mr. Lewis drove to the apartment where Mr. Mahan lived and that Mr. Lewis washed the knife in the kitchen sink and then traded the knife with Mr. Mahan for two wooden poles.  RT 250-253; *see also* RT 636 (sergeant Hansen's testimony regarding interview of Ms. Marr).  Ms. Marr testified that Mr. Mahan was sitting 2-3 feet away from Mr. Lewis when Mr. Lewis was washing the knife.  RT 252-53.

By contrast, Mahan testified that he did not recall trading a knife with Mr. Lewis for some poles, and did not recall Mr. Lewis coming to his (Mahan's) home and washing a knife.  RT 333.

[5] When he spoke to the police, Mr. Mahan had a much more vivid recollection of an early morning visit from Mr. Lewis than Mr. Mahan recalled on the stand.  Mr. Mahan had told police that, during the visit, Mr. Lewis had accused Mr. Mahan of having inappropriate relations with Mr. Lewis' girlfriend.  Mr. Mahan also had told the police that, as Mr. Mahan reached into his pocket, Mr. Lewis told him "'don't put your hands in your pocket,' like (inaudible) people are going to get stuck around here.  Saying he was going to stab people.'"  Cal. Ct. App. Opinion, p. 16.  At trial, however, Mr. Mahan professed not to remember this information.  *Id.*

United States District Court
For the Northern District of California

1    to test his credibility and the like.  So, that one, I think that would be
2    fine under 352.

3    RT 586-87.  The trial court suggested to defense counsel that a limiting instruction regarding the

4    Gerber knife could be given, but counsel did not request such an instruction.  (The failure to request

5    a limiting instruction is the basis for one of the ineffective assistance of counsel claims discussed

6    later in this order.)

7                          b.    The Sword and The Blood In The Van

8            Evidence was introduced that connected Mr. Lewis to a van with blood in it and a sword.

9    The evidence came in to impeach Jarred Stapp, who had (despite telling the police of such a

10   statement) testified that he did not recall Mr. Lewis telling him that he (Lewis) had killed someone.

11   Mr. Stapp had lived with Mr. Lewis at the Clean and Sober House, and was called as a witness to

12   testify about Mr. Lewis' whereabouts around the time of the murder and Mr. Lewis' admission that

13   he had killed someone.  At trial, Mr. Stapp claimed he could not remember much of what he had told

14   police or of what had transpired between Mr. Stapp and Mr. Lewis due to a preexisting head injury

15   and being high on methamphetamine.  Mr. Lewis' memory was different when he spoke to police

16   several weeks after the murder.

17           When Stapp had contacted police, he expressed concern about blood
             in the van that he had bought from Sovereign (though his call indicates
18           Lewis as the person who sold him the van). At trial, Stapp was asked,
             "Were you concerned about the fact that you thought there was
19           something in your van?" Stapp replied, "I have no idea."

20           In his call to the police, Stapp also said that Lewis "left a sword on the
             premises of the clean and sober house property. So I mean, I don't
21           know what the guy was murdered with or whatever but if it was a big
             knife or something like that, there's a sword ya know." At trial, Stapp
22           said that he had found a sword in the yard at the clean and sober house
             and that he had turned it over to the police. When asked if he had told
23           the police who he thought the sword belonged to, Stapp replied, "I told
             them it might have been his. I don't know for a fact but...." Stapp was
24           then asked, "Do you remember telling law enforcement that you knew
             it belonged to him because you had seen him with it?" and Stapp
25           replied, "I seen him with one."

26           The prosecution requested permission from the court to admit the
             recorded telephone call that Stapp had made to the police "not only as
27           a prior inconsistent statement for what he testified to on the stand but
             also to refute his suggestion to this jury that he was unable to really
28           recall what took place between he and the defendant." The defense

United States District Court

For the Northern District of California

objected to introduction of the recorded call because it was hearsay and unduly prejudicial. After listening to the tape, the court observed: "The tape doesn't seem to sound like he has any memory problems whatsoever. Seems pretty clear. He's not stumbling over what happened or what was in the van. Seemed like a pretty clear memory in this tape." The court determined that Stapp was "either being deliberately evasive or untruthful" and that his testimony was not due to "an honest memory loss." The court decided to "allow it in under the hearsay exception since he is subject to being recalled." The court also overruled the section 352 objection as to Stapp's concern about blood in the van he bought from Sovereign because the later police interview with Stapp included the police acknowledgment that any blood in the van was from before Van Alstine's murder and not related to the crime with which Lewis was charged.

Cal. Ct. App. Opinion at 19-20.

The California Court of Appeal rejected Mr. Lewis' state law challenge to the admission of the evidence of blood in the van and the sword. "The evidence in the recorded phone call that Stapp was concerned about blood in the van was relevant as impeachment to demonstrate to the jury that Stapp's lack of memory was feigned." *Id.* at 21. The fact that the evidence involved blood did not require its exclusion. Mr. Stapp had purchased the van before the killing, and it was made clear to the jury that "nothing found in the van was relevant to the charges against Lewis." *Id.* "Evidence of blood on an object associated with a defendant that is manifestly unrelated to the charges against defendant has little if any prejudicial effect. Jurors understand from their common experience that traces of their own blood may be found on objects associated with them." *Id.*

The California Court of Appeal also found that Mr. Lewis forfeited his state law claim regarding the admission of the evidence that Mr. Lewis had a sword because the evidence had not been objected to at trial. *Id.* at 21.

### c.     Blood On Mr. Lewis' Clothing

The T-shirt Mr. Lewis was wearing when arrested tested positive for the presence of blood. The DNA test results were not ready by the time the hearing was held on a defense motion *in limine* to exclude the blood test results. The trial court stated that, if the DNA test results were not ready by trial time, since the evidence was that there was human blood on the defendant's clothes, the evidence would be relevant and Lewis could argue about the weight for the jury to give the evidence. The court observed that, on the other hand, if the DNA tests were ready by trial time and

showed that the blood was not the victim's blood, that "'pretty much ends [the] value of that evidence.'" Cal. Ct. App. Opinion at 22. The trial court also "opined, without any final ruling on Lewis's motion, that the evidence would not be admitted, unless Lewis wished to make some use of it." *Id.* The DNA test results came back before trial and showed that the blood on Lewis's T-shirt was his own blood. (The blood was only on one sleeve of the shirt.) The court asked defense counsel whether he wanted to make further argument, and counsel said he did not "'have an issue with'" the evidence since it was his client's own blood. *Id.* Defense counsel also did not object to the criminalist's testimony about the blood test results, and her "testimony was immediately followed by testimony, without objection, that blood was actually found only on Lewis's T-shirt and that this blood was his own." *Id.*

The California Court of Appeal also found that Mr. Lewis forfeited his state law claim regarding the admission of the blood test result evidence by withdrawing the motion *in limine* and not objecting to the evidence at trial. *Id.*

### 2. State Court of Appeal's Rejection of Due Process Claim

The California Court of Appeal rejected Lewis' contention that the blood and weapons evidence, even if properly admitted under state law, could lead the jury to draw improper inferences about his character, and therefore violated his right to due process. The state appellate court noted that the U.S. Supreme Court "has expressly reserved opinion on the question at issue," and that the California Supreme Court has "rejected the assertion that relevant evidence, properly admitted, can constitute a violation of federal due process rights." *Id.* at 24-25 (citing (*Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) and *People v. Gurule*, 28 Cal. 4th 557, 656 (Cal. 2002)). The California Court of Appeal was unpersuaded by Mr. Lewis' argument that was based largely on a Ninth Circuit case, *Garceau v. Woodford*, 275 F.3d 769 (9th Cir. 2001), a case that had been overruled on procedural grounds in *Woodford v. Garceau*, 538 U.S. 202 (2003). "Because *Garceau* constitutes neither state nor federal precedent, we decline to consider it when California precedent speaks clearly on the matter." Cal. Ct. App. Opinion at 25.

3.   <u>Analysis of Federal Due Process Claim</u>

Mr. Lewis contends that the admission of the blood and weapons evidence violated his right to due process because it "created a substantial risk that the jury could convict [him] based on a perceived violent propensity." Docket # 1 at 62.   He argues that the existence of "some possible relevance" in the evidence does not negate the due process violation that occurs with the admission of propensity evidence.

The United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991).  In fact, *Estelle v. McGuire* specifically left open the question regarding propensity evidence. *See id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she was brought to a hospital and died from numerous injuries suggestive of recent child abuse. Defendant told police the injuries were accidental.  Evidence was admitted at trial that the coroner discovered during the autopsy older partially healed injuries that had occurred 6-7 weeks before the child's death.  *Id.* at 65.  Evidence of the older injuries was introduced to prove "battered child syndrome," which "exists when a child has sustained repeated and/or serious injuries by nonaccidental means."  *Id.* at 66.   The state appellate court had held that the proof of prior injuries tending to establish battered child syndrome was proper under California law.  *Id.*  In federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its determination that the evidence was improperly admitted under state law.  *Id.* at 66-67.  The U.S. Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was properly admitted under state law because "'federal habeas corpus relief does not lie for errors of state law.'"  *Id.* at 67.  The Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point. [¶] Concluding, as we do, that the prior injury evidence was relevant to an issue in the

1   case, we need not explore further the apparent assumption of the Court
2   of Appeals that it is a violation of the due process guaranteed by the
    Fourteenth Amendment for evidence that is not relevant to be received
3   in a criminal trial. We hold that McGuire's due process rights were not
    violated by the admission of the evidence. *See Spencer v. Texas*, 385
    U.S. 554, 563–564, 87 S.Ct. 648, 653–654, 17 L.Ed.2d 606 (1967)
4   ("Cases in this Court have long proceeded on the premise that the Due
    Process Clause guarantees the fundamental elements of fairness in a
5   criminal trial.... But it has never been thought that such cases establish
    this Court as a rulemaking organ for the promulgation of state rules of
6   criminal procedure").

7   *Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

8       The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of

9   prior convictions did not violate due process. The Supreme Court explained in *Spencer* that,

10  although there may have been other, perhaps better, ways to adjudicate the existence of prior

11  convictions (e.g., a separate trial on the priors after the trial on the current substantive offense

12  resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did

13  not violate due process. *Id.* at 563-64. "In the face of the legitimate state purpose and the

14  long-standing and widespread use that attend the procedure under attack here, we find it impossible

15  to say that because of the possibility of some collateral prejudice the Texas procedure is rendered

16  unconstitutional under the Due Process Clause as it has been interpreted and applied in our past

17  cases." *Id.* at 564.

18      *Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support

19  of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the

20  trial with unfairness as to deny due process of law. *See Estelle v. McGuire*, 502 U.S. at 75. In

21  *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated

22  the defendant's due process rights. The evidence at issue in *Lisenba* was live rattlesnakes and

23  testimony about them to show they had been used by the defendant to murder his wife. "We do not

24  sit to review state court action on questions of the propriety of the trial judge's action in the

25  admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification

26  of the snakes so infused the trial with unfairness as to deny due process of law. The fact that

27  evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom

28

United States District Court
For the Northern District of California

1   cannot, for that reason alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at

2   228-29.

3       These three Supreme Court cases declined to hold that the admission of prejudicial or

4   propensity evidence violates the defendant's due process rights.  No Supreme Court cases since

5   *Estelle v. McGuire* have undermined the holdings in these three cases.  In other words, there is no

6   Supreme Court holding that the admission of prejudicial or propensity evidence violates due

7   process.

8       When the U.S. Supreme Court "cases give no clear answer to the question presented, let

9   alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed]

10  clearly established Federal law.' . . .  Under the explicit terms of § 2254(d)(1), therefore, relief is

11  unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (alterations in original) (quoting

12  *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

13      Mr. Lewis cannot obtain federal habeas relief on his claim that the admission of the evidence

14  violated his right to due process because it showed a propensity toward violence.  Relief is

15  precluded because, as discussed above, the United States Supreme Court has never held that the

16  introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Wright*,

17  552 U.S. at 125-26 (no relief on denial of counsel claim under *United States v. Cronic*, 466 U.S. 648

18  (1984), because Supreme Court had never determined the standard to apply where attorney appeared

19  at hearing by speakerphone); *see, e.g, Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009)

20  (denying habeas relief upon finding that trial court's admission of irrelevant pornographic materials

21  was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable

22  application of, clearly established Federal law under § 2254(d)); *Alberni v. McDaniel*, 458 F.3d 860,

23  865 (9th Cir. 2006) (denying habeas relief on claim that due process was violated by admission of

24  evidence of defendant's past violent actions and explosive temper to show propensity due to *Estelle*

25  *v. McGuire's* reservation of the question whether propensity evidence violates due process); *Moses*

26  *v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009) (holding that, where balancing test for excluding

27  evidence is creation of Ninth Circuit law and Supreme Court has not directly considered whether

28  trial court's exercise of discretion to exclude evidence violated defendants' constitutional right to

United States District Court
For the Northern District of California

27

United States District Court

For the Northern District of California

1  present evidence, state court's failure to use Ninth Circuit's balancing test is not contrary to or an

2  unreasonable application of clearly established Supreme Court precedent).

3       The Supreme Court has established a general principle of "fundamental fairness," i.e.,

4  evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of

5  justice'" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting

6  *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of

7  evidence to identify perpetrator and link him to another perpetrator even though the evidence also

8  was related to crime of which defendant had been acquitted). Thus, apart from the alleged

9  impropriety of admitting propensity evidence, the court may consider whether the evidence was "so

10 extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Id.* However,

11 Mr. Lewis does not identify any vice in the evidence other than that it tended to show his propensity

12 for violence, and does not meet the very demanding standard of being so extremely unfair that its

13 admission violates fundamental conceptions of justice.

14      In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair

15 and violate due process  "[o]nly if there are no permissible inferences the jury may draw from the

16 evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by

17 the prosecution will often raise more than one inference, some permissible, some not; we must rely

18 on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible

19 inferences the jury may draw from the evidence can its admission violate due process. Even then,

20 the evidence must 'be of such quality as necessarily prevents a fair trial.' Only under such

21 circumstances can it be inferred that the jury must have used the evidence for an improper purpose."

22 *Jammal*, 926 F.2d at 920 (internal citation and footnote omitted).[6]

23 _____

24     [6] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car
   when they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000

25 (but no drugs) in the trunk of Jammal's car when they arrested Jammal. At trial, Willis said he had
   no idea the drugs and money were in the trunk of Jammal's stolen car until police opened it. The

26 prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of
   Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also

27 with a large stash of cash in his trunk. Jammal unsuccessfully objected that this evidence effectively
   branded him a drug dealer and was therefore inadmissible character evidence. The Ninth Circuit

28 explained that state law evidence rules were beside the point in a federal habeas proceeding and any
   problem in the jury inferring that Jammal had put the $47,000 and drugs in the car earlier (even if

United States District Court

For the Northern District of California

Here, there were permissible inferences that could be drawn from the Gerber knife, sword and blood-in-the-van evidence: that Messrs. Mahan and Stapp were untruthful on the witness stand. The credibility of both these witnesses was at issue, and the prior inconsistent statements impeached their credibility. *See* Cal. Ct. App. Opinion at 17-21.  As the state appellate court explained, the knife evidence was relevant for the purpose of impeaching Mr. Mahan, and the blood-in-the-van evidence was relevant for the purpose of impeaching Mr. Stapp.  *See id.*  The sword evidence also was relevant for the purpose of impeaching Mr. Stapp because, like the blood-in-the-van evidence, it was part of the detailed information in Mr. Stapp's recorded statement to police that contradicted Mr. Stapp's claimed inability to remember any details of his interactions with Mr. Lewis.  The jury could draw the inference that Mr. Mahan's and Mr. Stapp's trial testimony was not credible due to the divergence between their recorded statements to the police and their testimony in court.  Because this inference is permissible, the state appellate court did not unreasonably apply Supreme Court authorities in holding that the admission of the knife, sword and blood-in-the-van evidence did not violate due process. *See Jammal*, 926 F.2d at 920.

Mr. Lewis contends that the impeachment evidence was unnecessary because Mr. Mahan and Mr. Stapp already had credibility problems.  The fact that the witnesses may have had general credibility problems based on their foggy memories as well as their history of drug use and brain injuries does not mean that it was improper to admit the evidence of prior inconsistent statements that showed them to be lying on the witness stand.  *See generally Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011) ("There is a substantial difference between 'general evidence of

---

impermissible under state law) was not a constitutional problem because the inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his trunk.  *Jammal*, 926 F.2d at 920.

*Jammal* is one of the few cases that gives any guidance as to what might amount to the introduction of evidence that might amount to fundamental unfairness.  The Ninth Circuit continues to use the *Jammal* "permissible inference" test in habeas cases governed by the AEDPA.  *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal* and concluding that admission of graffiti evidence did not violate due process because there were permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008) (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

United States District Court

For the Northern District of California

1   untrustworthiness and specific evidence that a witness has lied.'" (quoting *Benn v. Lambert*, 283

2   F.3d 1040, 1056-57 (9th Cir. 2002)).

3        Any possibility that the evidence made the trial fundamentally unfair was even more remote

4   because the jury was made aware that the Gerber knife, the blood in the van, and the sword were not

5   connected to the killing for which Mr. Lewis was on trial.  And the jury was informed that the van

6   with the blood in it belonged to Ms. Sovereign, rather than Mr. Lewis, further suggesting the lack of

7   connection between that blood and Mr. Lewis or the murder.

8        The evidence of the blood on the T-shirt Mr. Lewis was wearing at the time of his arrest does

9   not appear to have been relevant – except possibly to show the thoroughness of the investigation, as

10  respondent argued in state court, *see* Docket # 21-1 at 55 -- but the jury was made aware that the

11  blood was Mr. Lewis' blood and not that of the victim.  There was no evidence that Mr. Lewis was

12  injured, let alone cut, when he stabbed the victim.  There was no suggestion that the blood on Mr.

13  Lewis' shirt was connected to the stabbing, and the T-shirt was one that Mr. Lewis was wearing two

14  weeks after the killing.  As the state appellate court noted, "[j]urors understand from their common

15  experience that traces of their own blood may be found on objects associated with them."  Cal. Ct.

16  App. Opinion at 21.  The admission of the evidence that Mr. Lewis' own blood was on his T-shirt

17  did not render his trial fundamentally unfair.  "Even if there are no permissible inferences the jury

18  can draw from the evidence in question, due process is violated only if the evidence is 'of such

19  quality as necessarily prevents a fair trial.'"  *Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006)

20  (quoting *Jammal*, 926 F.2d at 920); *see e.g., id.* (due process not violated by admission of

21  "emotionally compelling" evidence showing victim as a young girl, even though it was irrelevant);

22  *Plascencia v. Alameida*, 467 F.3d 1190, 1203-04 (9th Cir. 2006) (citing *Jammal* and concluding that

23  some evidence about the use of a drug was irrelevant but its admission did not make the trial

24  fundamentally unfair).

25       "[E]valuating whether a rule application was unreasonable requires considering the rule's

26  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-

27  by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Bearing in mind the

28  extremely general nature of the Supreme Court's articulation of a principle of "fundamental

United States District Court

For the Northern District of California

1  fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental

2  conceptions of justice'" may violate due process, (*see Dowling*, 493 U.S. at 352) – the California

3  Court of Appeal's rejection of Mr. Lewis' due process claim was not contrary to or an unreasonable

4  application of clearly established federal law as set forth by the Supreme Court.  *See*

5  *generally Holley*, 568 F.3d at 1101 (denying writ because, although Supreme Court "has been clear

6  that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair,

7  it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

8  constitutes a due process violation sufficient to warrant issuance of the writ." (internal citation

9  omitted)).

10  C.    Ineffective Assistance of Counsel Claims

11        Mr. Lewis contends that he received ineffective assistance of counsel because trial counsel

12  failed to request a limiting instruction for the Gerber knife evidence and failed to renew his

13  objection to the evidence of the blood test results for the T-shirt.

14        1.    State Court Decision

15        The California Court of Appeal rejected the ineffective assistance of counsel claim.  That

16  court correctly identified *Strickland v. Washington*, 466 U.S. 668, 687 (1984), as the governing

17  standard and applied it.  Cal. Ct. App. Opinion at 23.  The court noted *Strickland*'s command that

18  "'[j]udicial scrutiny of counsel's performance must be highly deferential,'" and should strive to

19  avoid "the distorting effects of hindsight.'"  *Id.* (quoting *Strickland*, 466 U.S. at 689). The state

20  appellate court concluded there was no deficient performance by counsel.

21        The trial court offered to give a limiting instruction concerning
      Mahan's statements to police about the Gerber knife. Lewis's counsel

22    decided not to request such an instruction, believing that doing so
      would cause confusion or bring more attention to the matter. Defense

23    counsel made a tactical choice not to request a limiting instruction on
      considerations that are commonly of concern in courtroom practice.

24    Nothing in the record leads us to believe that counsel's choice fell
      below the standards of reasonable decision making.

25
      As for the evidence about blood on Lewis's clothing, the record does

26    not indicate a reason for defense counsel's failure to object to its
      admission. The evidence conclusively showed that where blood had

27    actually been detected on Lewis's clothing, it was Lewis's own blood.
      This was potentially useful to the defense and nothing in the record

28    supports an argument that defense counsel did not make a tactical

United States District Court

For the Northern District of California

1             decision to allow the jury to hear that the victim's blood was not on
2             Lewis's clothing or that such a decision would have been
           unreasonable. Because the failure to object to the admission of this
3             blood evidence may have been a valid, tactical choice by defense
           counsel, this argument for ineffective assistance also fails.

4  Cal. Ct. of Appeal Opinion at 24.

5        2.    <u>Analysis</u>

6        The Sixth Amendment's right to counsel guarantees not only assistance, but effective

7  assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

8  judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

9  functioning of the adversarial process that the trial cannot be relied upon as having produced a just

10  result.  *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

11  must establish two things.  First, he must demonstrate that counsel's performance was deficient and

12  fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at

13  687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

14  that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

15  proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability

16  sufficient to undermine confidence in the outcome.  *Id.*  The relevant inquiry under *Strickland* is not

17  what defense counsel could have done, but rather whether his choices were reasonable.  *See Babbitt*

18  *v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

19        A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

20  counsel claims under § 2254.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011).  The

21  "question is not whether counsel's actions were reasonable.  The question is whether there is any

22  reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*,

23  562 U.S. 86, 105 (2011).

24          a.    <u>Failing To Request A Limiting Instruction On The Gerber Knife</u>

25        The record clearly supports the California Court of Appeal's finding that trial counsel made a

26  tactical decision not to request a limiting instruction about the Gerber knife.  During a discussion of

27  the jury instructions, the court asked whether either counsel wanted to say anything about the jury

28  instructions, and defense counsel responded that he had chosen not to ask for a limiting instruction

1  because it would be more confusing or call attention to the evidence.[7] It was not an unreasonable

2  application of *Strickland* for the California Court of Appeal to determine that counsel did not engage

3  in deficient performance when he made a tactical decision not to request a limiting instruction so as

4  to avoid confusing the jury and drawing further attention to the Gerber knife evidence.  Evidence

5  had been presented that the Gerber knife was not connected to the murder, i.e., the knife was

6  borrowed and returned long before the killing, and even was sold to a pawn shop before the killing.

7  *See* RT 324, 329, 649-651.  The trial court provided the jury a general instruction on evaluating

8  witness credibility (CT 321), and it was not deficient performance for counsel to believe that asking

9  for a specific limiting instruction regarding the Gerber knife would unduly emphasize the

10 importance of that knife and might confuse some jurors.   Counsel argued in closing that none of the

11 knives were connected to the killing.  RT 748-751.  There was evidence of several knives, and a

12 limiting instruction as to this particular knife would have given it an air of importance that it did not

13

14        [7] At a discussion of jury instructions, the following exchange occurred:

15  THE COURT: [D]id either counsel wish to state anything for the record, then, regarding the
    instructions?

16

17  [THE PROSECUTOR]: There was one submitted by counsel during the trial, your Honor. I
    understand he has withdrawn that instruction. It was a special instruction.

18  [DEFENSE COUNSEL]: It was regarding the impeachment issue and I'll leave the
    instruction in its present form. I think it's confusing, otherwise.

19

20  THE COURT: Oh. There was an indication on the record that he would be asking for some
    type of limiting instruction, but you decided not to do that because that would just confuse or
21  call more attention to something?

22  [DEFENSE COUNSEL]: I believe so.

23  THE COURT: Okay. Okay. So, then, we'll give – you are in agreement with the instructions
    as they are, relative to impeachment and contradictory statements, that is, conflicting
24  statements, I guess is what it was?

25  [DEFENSE COUNSEL]: Yes.

26  THE COURT: Prior inconsistent statements area. Thank you for clarifying that. You aren't
    asking for any additional instructions, [defense counsel]?

27  [DEFENSE COUNSEL]: I'm not.

28  RT 689-90.

33

United States District Court

For the Northern District of California

1    deserve and that the defense did not desire.  Mr. Lewis has not overcome the "'strong presumption'

2    that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than

3    'sheer neglect.'" *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Yarborough v. Gentry*,

4    540 U.S. 1 (2003) (per curiam)).

5          Although the California Court of Appeal did not reach the prejudice prong of the *Strickland*

6    test, there is no showing of prejudice by Mr. Lewis.  There is no evidence that suggests a

7    "reasonable probability" of a different outcome if the jury had received a limiting instruction for the

8    Gerber knife evidence.  The testimony of Mr. Mahan and a police sergeant established that the

9    Gerber knife was not connected to the murder.  In fact, none of the items seized from Mr. Mahan's

10   house were ever connected in any physical way to the killing.  RT 651.  Coupled with this evidence

11   that showed the Gerber knife was not connected to the killing, there was strong inculpatory

12   evidence.  The evidence included the following: while Ms. Marr drove Mr. Lewis around Eureka,

13   Mr. Lewis asked her to stop and invited the victim to get in the car; Mr. Lewis told Ms. Marr to

14   drive to Fields Landing, where the victim was stabbed and died; Mr. Lewis told Ms. Marr during the

15   drive that the victim had slept with Mr. Lewis' girlfriend; Ms. Marr demonstrated the attack she saw

16   by standing behind a detective and reaching around to punch him in the right side; the victim's stab

17   wound was consistent with a person standing behind him and reaching around to stab the victim in

18   the chest; Ms. Marr said that Mr. Lewis got back in the car and said, "I stabbed the guy.  He's going

19   to die soon," RT 636; Ms. Marr saw Mr. Lewis cleaning a knife at Mr. Mahan's place later on the

20   morning of the killing; and Mr. Stapp told police that, several days after the killing, Mr. Lewis told

21   him,  "I killed somebody," RT 543.  The Gerber knife evidence was quite limited – i.e., that Mr.

22   Mahan had loaned Mr. Lewis a Gerber knife long before the killing to deal with a problem with the

23   Bovencamps – and a limiting instruction would have had no reasonable probability of altering the

24   outcome of the proceedings.   Mr. Lewis is not entitled to the writ on his claim that counsel was

25   ineffective in not requesting a limiting instruction on the Gerber knife evidence.

26          b.      Failing To Renew An Objection to The Blood Test Results

27          Defense counsel initially objected to the blood test results at a time when those results

28   showed that there was human blood on Mr. Lewis' T-shirt but not whose blood it was.  Once further

1   tests revealed that it was Mr. Lewis' own blood, counsel did not renew his objection to the

2   introduction of blood test results.  Although counsel did not object to the evidence of the blood test

3   results, that evidence was not harmful to Mr. Lewis because the evidence was collected long after

4   the killing, involved only a small amount of blood on a sleeve of a shirt, and was Mr. Lewis' blood.

5   *See* RT 450 (the clothes were collected from Mr. Lewis on December 3, two weeks after the

6   stabbing); RT 450, 464 (only a small amount of blood had been found, i.e., a "brownish red staining

7   on the sleeve cuff" on one sleeve of the T-shirt); RT 466, 515 (the blood stain on the T-shirt was Mr.

8   Lewis' own blood).  No effort was made to suggest the blood was not Mr. Lewis' blood.

9        It was not an unreasonable application of *Strickland* for the California Court of Appeal to

10  determine that counsel did not engage in deficient performance when he did not renew his objection

11  to the blood test results.  The state appellate court observed that the evidence that it was Mr. Lewis'

12  blood (and not the victim's) on the T-shirt was "potentially useful to the defense and nothing in the

13  record supports an argument that defense counsel did not make a tactical decision to allow the jury

14  to hear that the victim's blood was not on Lewis's clothing or that such a decision would have been

15  unreasonable."  Cal. Ct. App. Opinion at 24.  Applying the "'highly deferential' look at counsel's

16  performance . . . through § 2254(d)'s 'deferential lens,'" *Cullen v. Pinholster*, 131 S. Ct. at 1403, it

17  cannot be said that the California Court of Appeal's rejection of Mr. Lewis' claim was contrary to or

18  an unreasonable application of *Strickland*.  The California Court of Appeal's analysis presents a

19  "reasonable argument that counsel satisfied Strickland's deferential standard," and that is sufficient

20  to bar relief under § 2254(d).  *See Harrington v. Richter*, 562 U.S. at 105.  Mr. Lewis is not entitled

21  to the writ on this claim.

22  D.     A Certificate Of Appealability Will Not Issue

23       Mr. Lewis has not "made a substantial showing of the denial of a constitutional right," 28

24  U.S.C. § 2253(c)(2), and this is not a case in which "reasonable jurists would find the district court's

25  assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

26  (2000).  Accordingly, a certificate of appealability is **DENIED**.

27  ///

28  ///

United States District Court
For the Northern District of California

## VI.   CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits.  The Clerk shall close the file.


IT IS SO ORDERED.


Dated: October 14, 2015

_____
EDWARD M. CHEN
United States District Judge